**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID KAUFMAN,<br><br>Defendant. | CRIMINAL NO.   1:25-mj-00972 |

**UNITED STATES' MOTION FOR AND MEMORANDUM**
**IN SUPPORT OF PRETRIAL DETENTION**

Defendant David Kaufman, a 44-year-old resident of Baltimore, Maryland, has been charged by a grand jury in the District of Massachusetts with persuading and enticing an 18-year-old victim to travel from Massachusetts to Maryland to engage in prostitution on two occasions, in violation of 18 U.S.C. § 2422(a). In addition, the government has amassed evidence that Kaufman has been victimizing minor males and young adults ranging in age from 14–20 by paying the minors for Child Sexual Abuse Material (CSAM) and coercing and enticing some of them to travel to Baltimore and elsewhere to engage in sex acts with him, which he videorecords. Kaufman typically provides his victims with gifts and money in exchange for CSAM and sex acts. The government moves to detain Kaufman pending trial because poses a serious risk of flight and obstruction. *See* 18 U.S.C. § 3142(f)(2)(A) and (B).

First, the defendant poses a serious flight risk. He currently faces up to 20 years in prison and other serious consequences for his conduct. The evidence against him is substantial and mounting, and the government is continuing to investigate allegations that, if charged, could involve mandatory minimum sentences of 15 years or more with potential guideline ranges that include life in prison. In particular, the government has a good faith basis to seek charges under 18 U.S.C. § 1591(a)(1) and (b)(2) for sex trafficking of a minor, which carries a 10-year mandatory

1

minimum sentence. These circumstances provide him with a significant disincentive to appear for trial. The defendant also has significant financial means. For these reasons, there are no conditions that will reasonably assure he will appear at trial to face the evidence and consequences of his conduct.

Second, the defendant's actions, as described below, compound the risk of flight and dangerousness, giving rise to "a serious risk that such person will obstruct or attempt to obstruct justice." 18 U.S.C. § 3142 (f)(2)(B). When various witnesses to the defendant's conduct became aware that the government was investigating him, and presumably notified him of such, the defendant began to take obstructive steps intended to hide his criminal conduct from the government and allow him to continue to abuse minors and young adults to derive sexual pleasure for himself. As set forth in more detail below, these steps included hiding payments for sex by paying victims in cash rather than via electronic transfer, and transferring videos from a cloud-based storage facility to other electronic storage locations.

Third, Kaufman's release would pose a profound danger to the community. The troubling evidence of the defendant's conduct amassed to date raises serious concerns about what he would do, particularly to children, if released into the community.

## STATEMENT OF FACTS

The government proffers the following facts in support of its motion to detain the defendant.

### I. The Defendant

Kaufman is 44 years old and owns and resides in a penthouse condominium at the Four Seasons in Baltimore. He receives a significant income from a trust fund, and he owns and operates a video game store in Timonium, Maryland. Kaufman operates a number of social media accounts

that he uses regularly, and in many of them, he does not use his real name and instead uses pseudonyms. He uses these accounts to communicate with others – including minors – online, and to exchange images, videos, and items of value.

## II. The Charged Offenses

Kaufman has been charged by a grand jury in the District of Massachusetts with two counts knowingly persuading, inducing, enticing, and coercing an individual identified as Victim 1 to travel in interstate commerce to engage in prostitution and aiding and abetting, in violation of 18 U.S.C. §§ 2422(a) and 2. Count 1 alleges Kaufman violated these statutes in or around February 2024; Count 2 alleges violations in or around March 2024. A portion of the government's evidence regarding those charges is set forth below.

### A. Count 1: February 2024 Travel

In or around January or February 2024, Victim 1 (then age 18), a resident of Massachusetts, was invited by his friend, Witness 1, to travel for a weekend from Massachusetts to Baltimore. In January 2024, Witness 1 and Kaufman had exchanged electronic messages about Witness 1 and Victim 1 visiting Kaufman in Baltimore.

Flight records confirm that Victim 1 and Witness 1 flew from Bradley Airport (BDL) to Baltimore Washington International (BWI) Airport on February 2, 2024, returning on February 4, 2024. Kaufman paid for the plane tickets. On the flight from BDL to BWI, Witness 1 told Victim 1 that he (Victim 1) might have to "do stuff" to get "full benefits" from Kaufman. Victim 1 understood that to mean that he would have to engage in sex acts with Kaufman in exchange for things of value, such as fancy dinners and nice gifts. At that time of that trip, Victim 1 was a senior in high school. Witness 1 was 17 years old, and Kaufman was 42 years old.

Kaufman picked up Victim 1 and Witness 1 from the Baltimore airport in his Mercedes and drove them to his residence, a penthouse at the Four Seasons in Baltimore. When they arrived at the residence, Kaufman told Victim 1 and Witness 1 to take their clothing off and shower together. Kaufman watched Victim 1 and Witness 1 shower together. Victim 1 was uncomfortable showering with Witness 1.

Kaufman then took Victim 1, Witness 1, and other adult friends out to dinner, after which they returned to Kaufman's residence. Kaufman provided Victim 1 and Witness 1 with alcohol and Victim 1 and Witness 1 also used marijuana. Victim 1 and Witness 1 became very intoxicated.

Kaufman then coerced Victim 1 and Witness 1 to go into Kaufman's bedroom and take off their clothes. Kaufman performed oral sex on both Victim 1 and on Witness 1. Victim 1 did not want to engage in the sexual activity with Kaufman, but was highly intoxicated and did not want to upset Kaufman or Witness 1. Kaufman used his iPhone to take a video of the sexual activity in his bedroom. Kaufman explained to Victim 1 that it was his practice to record his sex acts so that he could watch the videos afterward to get pleasure for himself.

In a recent interview, Witness 1 confirmed having commercial sex with Kaufman in Baltimore when Witness 1 was 17 years old. Specifically, Witness 1 disclosed that Victim 1 was present when Kaufman engaged in sex acts with Witness 1 in exchange for money. Witness 1 also disclosed that Kaufman video recorded the sex acts. Given that Witness 1 had not attained the age of 18 at the time of the offense, this evidence, along with other evidence in the government's possession, provides a good faith basis to seek to charge Kaufman with sex trafficking of a minor in violation of 18 U.S.C. § 1591(a)(1) and (b)(2).

Kaufman was upset because Victim 1 did not ejaculate during the oral sex that first night. On their second day in Baltimore, Kaufman repeated the same sex acts with Victim 1 and Witness 1.

Kaufman gave Victim 1 and Witness 1 an "allowance" for engaging in sex acts, paying specific amounts of money for specific sex acts. In addition to the payment that Witness 1, then a minor, would receive for his own sex acts with Kaufman, he also would receive an extra $500 or $1,000 for recruiting Victim 1 to travel with him to engage in sex with Kaufman. Kaufman bought Victim 1 gifts of clothing and accessories, including a Louis Vuitton bag. Kaufman's American Express credit card statement corroborates a February 4, 2024, charge of $4,165.80 at a Louis Vuitton store in McLean, Virginia.

Kaufman took Victim 1 and Witness 1 to Azumi's that weekend, a restaurant located in the Four Seasons in Baltimore. Kaufman's American Express statement reflects that he spent over $2,000 at Azumi's Restaurant on February 3, 2024.

Kaufman also sent Victim 1 money electronically in exchange for the sex acts that happened February 2-4, 2024 in Baltimore. Kaufman electronically transferred $700.00 to Victim 1 on February 3, 2024, and $750.00 on February 4, 2024.

    B.  Count 2: March 2024 Travel

On March 22, 2024, Witness 1 and Victim 1 again traveled on Southwest Airlines from Massachusetts, via BDL, to BWI. Kaufman paid for the flight. At the time of this flight, Witness 1 and Victim 1 were both 18 years old, and Kaufman was 43 years old. Upon arriving in Baltimore, the two teenagers again went to Kaufman's residence at the Four Seasons.

Kaufman took Victim 1 and Witness 1 to dinner, and Victim 1 and Witness 1 consumed alcohol, cocaine, and marijuana, at least some of which was provided by Kaufman. That night

Kaufman wanted to engage in sex acts with Victim 1, but Victim 1 told Kaufman he didn't want to. Kaufman responded by getting "really upset." Kaufman told Victim 1 about trauma Kaufman experienced in his childhood, explaining that he previously engaged in self-harm and that he (Kaufman) had suicidal ideations. Kaufman showed Victim 1 photos of himself at the emergency room with his arm cut all the way up to his shoulder to prove that he had harmed himself before. Kaufman then told Victim 1 that he was going to cut himself or jump off his balcony. Victim 1 understood Kaufman to be threatening to hurt himself if Victim 1 didn't engage in sex acts with him. Victim 1 then engaged in sex acts with Kaufman. Again, Kaufman gave Victim 1 oral sex and videorecorded it.

During this March trip to Baltimore, in addition to compensating Victim 1 with gifts in exchange for the sex acts, Kaufman also paid Victim 1 with cash, which Kaufman took from a big safe located in his bedroom closet. Kaufman told Victim 1 that he was scared of the government seeing that he was sending money to a lot of people electronically, so he wanted to pay in cash. Kaufman also told Victim 1 that Kaufman had a lot of "clients" to whom he paid money in exchange for sex acts or pornographic images.

Kaufman also bought gifts for Victim 1 and Witness 1 during the March trip to Baltimore. For example, the government obtained a photograph taken March 23, 2024, of Victim 1 and Witness 1 standing in a store, with a caption reading, "Allen Edmonds, Baltimore, MD." Kaufman used his American Express card to charge $485.48 at Allen Edmonds in Baltimore on March 23, 2024.

### III. Additional Evidence Obtained in the Investigation

The government has gathered evidence that indicates that Kaufman was engaged in coercing and enticing other individuals to travel for commercial sex and/or paying for

pornographic images and videos at least through the beginning of 2025. Specifically, the government obtained evidence that Kaufman used Venmo to transfer $2,000 to Witness 1 on February 22, 2025, and made other money transfers to him prior to that date. In addition, Witness 1 sent a message to Kaufman on April 15, 2025 asking Kaufman to send him money.

The government has also located evidence showing that Kaufman and others victimized multiple minors (Minor 1, Minor 3, Minor 4, and Minor 5) by engaging or attempting to engage in sex acts with them in exchange for money and gifts, and/or purchasing or attempting to purchase CSAM from them. All of these minors were between 14 and 17 years old when victimized and reside in Western Massachusetts except Minor 3, who resides in Connecticut. They are all friends or former friends with Witness 1. Minors 1, 3, 4, and 5 are or have been connected to Kaufman on Snapchat.

### A. Evidence of Minors Traveling to See Kaufman in Exchange for Payment

As set forth below, the government has evidence that Minors 1, 3, and 4 traveled on various dates with Witness 1 to meet Kaufman in person and that Kaufman paid them in gifts, money, or both, likely in furtherance of grooming them or in exchange for sex acts.

#### 1. June 7-9, 2024 Trip to Baltimore

Minor 4, Witness 1, and Witness 1's (adult) girlfriend at the time traveled round-trip from Massachusetts to BDL to BWI on June 7-9, 2024. Kaufman paid for the plane tickets. At the time of this trip, Minor 4 was 16, Witness 1 was 18, and Kaufman was 43.

Kaufman electronically sent $2,000 to Minor 4 on June 8, 2024, while he was in Baltimore. Kaufman also purchased a television and television stand for $239.27 from his Amazon.com account on June 8, 2024, and had those items shipped to Minor 4 at his home address in Massachusetts.

7

### 2. June 27-29, 2024 Trip to Baltimore

On June 27-29, 2024, Minor 4 and Witness 1 again traveled to Baltimore and Kaufman paid for the plane tickets. Minor 4 was 16 years old at the time of this trip, and Witness 1 was 18. The government has obtained photographs of that show Minor 4 at the Four Seasons in Baltimore during that timeframe, including a photo sent on June 29, 2024 of Minor Victim 4 holding a large amount of U.S. currency in front of his face. Text over the photo says "Four Seasons, Baltimore, MD."

Witness 1 disclosed to investigators that Minor 4 told him that he engaged in sex acts with Kaufman in exchange for cash.

Kaufman made a number of additional electronic transfers of money to Minor 4 between June 2024 and October 2024 (including the $2,000 on June 8, 2024 discussed above), totaling at least $8,450.

### 3. July 26-27, 2024 Trip to Boston

On July 26, 2024, Witness 1, Victim 1, Minor 1, and Minor 3 drove together to Boston, Massachusetts, for a night out. At the time of this trip, Witness 1 and Victim 1 were both 18, and Minor 1 and Minor 3 were both 17. On the drive to Boston, Witness 1 told Victim 1 that Kaufman was actually in Boston that night visiting a client, and that Minor 3 was going to "do stuff" (which Victim 1 understood to mean sex acts, specifically oral sex) with Kaufman that night. Upon learning they were going to meet Kaufman, Victim 1 refused to go out with them and stayed in their hotel room in Quincy, Massachusetts. That night, Witness 1, Minor 1, and Minor 3 went out to meet Kaufman in Boston, and the three came back to the hotel in Quincy very intoxicated. Witness 1 was clapping and laughing and saying, "[Minor 3] got his dick sucked for money."

8

Amtrak records confirm that Kaufman had purchased round-trip train tickets from Baltimore to Boston July 25-27, 2024. Kaufman's American Express statement shows a number of credit card charges in the Boston area on July 26, 2024 and July 27, 2024, including but not limited to $297.29 at Lenox Sophia restaurant in Boston, $302.98 at Bar Vlaha in Brookline, and a stay at the Four Seasons Hotel in Boston.

### 4. August 27-28, 2024 Trip to Baltimore

Minor 3 and Witness 1 traveled round trip from BDL to BWI August 27-28, 2024. At the time of this trip, Minor 3 was 17 and Witness 1 was 18. Kaufman's American Express statement shows a number of purchases made on August 27, 2024, including $386.90 at Under Armour in Baltimore and $185.60 at Marshalls in Baltimore. Kaufman sent Witness 1 money in at least two separate electronic transactions on August 28, 2024, the first for $240.00, the second for $300.00. The government has obtained a video of Kaufman performing oral sex on Witness 1 with a last modification date of August 28, 2024.

### 5. September 10-12, 2024 Trip to Baltimore

On September 10-12, 2024, Minor 1 and Witness 1 traveled round-trip from Massachusetts to Baltimore in Witness 1's vehicle. At the time of this trip, Minor 1 was 17 and Witness 1 was 18. License plate readers at the Four Seasons residence at 300 International Drive in Baltimore show Witness 1's vehicle parked in the parking garage at the Four Seasons on September 11, 2024. The government has obtained photographs and videos showing Minor 1 in the Four Seasons Baltimore during that time, including one photo showing Minor 1 asleep on a beanbag in Kaufman's penthouse.

B. <u>Additional Evidence of Travel for Prostitution</u>

There is evidence that Kaufman regularly purchased sexual images and videos from Witness 1 and others online. Kaufman's online communications show that after he purchases sexual images, he sometimes negotiates and arranges for the individuals depicted in the images to travel to Baltimore to engage in sex acts with him in exchange for money or gifts. The government has evidence that Kaufman communicated individually with multiple young adults about the commercial sex that Kaufman wanted to purchase from them, including very specific details about the sex acts that Kaufman desired. Those sex acts are the same commercial acts that Kaufman is alleged to have engaged in with Victim 1 and Witness 1.

1. *Male 1*

For example, Kaufman used Snapchat to communicate with a male user who was 19 or 20 years old ("Male 1") and who does not live in Maryland. In June 2023, Kaufman sent Male 1 a message on Snapchat asking for a video of himself engaging in explicit sexual conduct, including masturbation. The conversation continued as Male 1 and Kaufman negotiated a price for the video. They settled on $10,000, with partial payment up front and the rest later. This conversation coincides with a $5,000 CashApp transaction on June 21, 2023, from Kaufman's account to an account using the name "Joseph Smith." In July 2023, and additional $5,000 was transferred on CashApp from Kaufman to "Joseph Smith."

Then on September 2, 2023, Male 1 messaged Kaufman asking if he would pay for another video that included masturbation and other sex acts. During the negotiation, Male 1 messaged Kaufman, "u not trusting me with this makes me think why would i trust to fly to stay in ur house and let you film that video doing that to me." This conversation coincides with a transfer of $5,000 from Kaufman to an account in Male 1's name. American Express records show that in April 2024,

10

Kaufman bought a plane ticket for Male 1 to fly to Baltimore. Financial records indicate that Kaufman has transferred over $80,000 to accounts in Male 1's name.

    2. *Male 2*

In May and June of 2024, Kaufman used Snapchat to communicate with another teenage male who had just turned 18 years old ("Male 2") who does not live in Maryland. On April 12, 2024, Kaufman placed an order on Amazon.com for computer items, including webcams, lighting devices, webcam and light mounts, and other items, all to be delivered to Male 2's residence; the order totaled $924.35.

In June 2024, Kaufman messaged Male 2, "Have you considered spending the rest of the summer down here?" Among other things, Kaufman messages Male 2 with his address at the Four Seasons and a photo of a virtual credit card in Kaufman's name. On June 26, 2024, Male 2 sent a picture of his state identification card to Kaufman. Kaufman used his American Express to purchase plane tickets for Male 2 to travel from Male 2's home state to Baltimore on June 6, 2024 and June 29, 2024. Travel for these flights was to occur on June 6, 2024, and July 7, 2024. Kaufman also made electronic transfers to Male 2 in October 2024, totaling $620.00. The government has reviewed pornographic images and videos in Kaufman's accounts that include images of Male 2.

    3. *Witness 1*

The government has obtained multiple videos showing Kaufman and Witness 1 engaging in sex acts that were last modified between March and August 2024. Between May 2024 and October 2024, Kaufman sent Witness 1 over $14,000 in electronic transfers.

    C. <u>Soliciting and Receiving CSAM</u>

The government also has evidence indicating that some of the known minors sent nude images or videos to Kaufman and that Kaufman paid them for these images. For example, Minor

11

5 told a witness that he sent nude images of himself, mostly images of his penis (when he was 14 years old) to Kaufman in exchange for payment, and that Witness 1 set that up. To date, the government has gathered evidence that Kaufman sent accounts in Minor 5's names over $1,200 between January and June 2024. There are also financial transactions that indicate that, in and prior to January 2024, Witness 1 may have been funneling additional payments from Kaufman to Minor 5 through his (Witness 1's) accounts.

The government has also obtained evidence that Kaufman sent Minor 4 gifts of value during a time period when Minor 4 appears to have been in Massachusetts and not visiting Kaufman in person, indicating that Kaufman also may have been paying Minor 4 for nude images. The government has evidence that Kaufman sent Minor 4 at least $6,400 between June 2024 and October 2024 on dates when Minor 4 does not appear to have been in Baltimore. Minor 4 was 16 at that time.

### IV. Kaufman's Efforts to Obstruct

In the course of this investigation, government investigators have met with multiple subjects, witnesses, and victims, many of whom continued to have contact with Kaufman. It is clear that Kaufman was at least aware that investigators were seeking to interview some of the teenagers that he interacted with. It is also clear that Witness 1 provided Kaufman with some information regarding the existence of an investigation. For example, on October 20, 2024, Kaufman exchanged electronic messages with an individual in which the individual attempted to reassure Kaufman that the FBI was not investigating him. Kaufman responded that Witness 1 had told him not to text because "the cops have my phone."

Kaufman took other steps to hide evidence of his conduct and obstruct investigators. He told Victim 1 that he was afraid of the government noticing his electronic money transfers, so he used cash more often to pay for his commercial sex.

In addition, Victim 1, Witness 1, and Kaufman were all in Kaufman's bedroom in February 2024 when Kaufman videorecorded his commercial sex acts with Witness 1 and with Victim 1. Witness 1 was 17 years old during the February 2024 trip to Baltimore. Witness 1 was 18 years old during the March 2024 trip to Baltimore, during which Kaufman also videorecorded his commercial sex with Witness 1 and Victim 1. At some point after the March 2024 trip, Witness 1 told Victim 1 that when Witness 1 was visiting Kaufman in Baltimore again, Kaufman showed Witness 1 videos showing Kaufman engaging in sex acts with Victim 1, indicating that Kaufman had saved the videos.[1]

The government has obtained a video from Kaufman's iCloud account that was last modified on March 23, 2024 that shows Kaufman performing oral sex on Witness 1 in the bedroom of Kaufman's residence. Notably, no sex acts reportedly filmed between Kaufman and Witness 1 that occurred prior to Witness 1 turning 18 were preserved on Kaufman's iCloud, even though in February 2024, Victim 1 was in the room and knew that Kaufman was recording himself perform oral sex on Witness 1 and on Victim 1. Kaufman either deleted the February 2024 videos or moved them to a different electronic storage location. Similarly, Kaufman video recorded the March 2024 sex acts with Victim 1, but those videos were not preserved on Kaufman's iCloud.

Kaufman's efforts to move or delete videos that (1) show him engaging in commercial sex with a minor (Witness 1 in February 2024) and (2) show him engaging in commercial sex with an

---

1    It is unknown whether the videos Kaufman played for Witness 1 were from the February 2024 trip to Baltimore or the March 2024 trip to Baltimore.

individual he believes may have reported the conduct to law enforcement (Victim 1), demonstrate that he has attempted to hide evidence of his illegal conduct to evade law enforcement detection.

**ARGUMENT**

Congress empowered judicial officers to release or detain defendants pending trial. 18 U.S.C. § 3141(a). Detention determinations proceed pursuant to the terms of 18 U.S.C. § 3142. Under § 3142(f)(2), the Court must hold a detention hearing upon the government's motion (or sua sponte) when the case involves "a serious risk that [the defendant] will flee" or "a serious risk that [the defendant] will obstruct or attempt to obstruct justice." 18 U.S.C. § 3142(f)(2). Ultimately, the Court shall detain a criminal defendant pending trial upon a determination that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community...." 18 U.S.C. § 3142(e); *United States v. Stewart,* 19 F. App'x 46 (4th Cir. 2001). On the issue of flight, the government must prove that the defendant is a serious risk of flight by a preponderance of the evidence. *United States v. Stewart,* 19 F. App'x 46 (4th Cir. 2001). When seeking a detention order, the government may proceed by proffer of evidence. *See United States v. White*, 2015 WL 2374229, at *2 (D. Md. May 15, 2015).

Although the Court cannot order the defendant's detention based on dangerousness alone, see *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988), obstruction of justice is a stand-alone basis justifying detention pending trial. *See United States v. Acevedo-Ramos*, 755 F.2d 203 (1st Cir. 1985) (upholding detention before trial based on the risk that the defendant would obstruct or attempt to obstruct justice); see also *United States v. Mehanna*, 669 F. Supp. 2d 160, 160, 166 (noting that obstruction is an independent ground for detention under (f)(2) and finding that the government met its burden to detain the defendant on that basis). Once the Court determines that

the government has met its burden under risk of flight and/or obstruction of justice, dangerousness is a relevant consideration in determining whether the Defendant can ultimately be released on conditions.

In evaluating whether conditions can reasonably be fashioned, the Court must consider the following: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the defendant's history and personal characteristics; and (4) dangerousness. 18 U.S.C. § 3142(g). With respect to dangerousness, the Senate Report accompanying the Bail Reform Act explains that dangerousness is not limited to physical violence and includes continued criminal activity:

> The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.

S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3195; *see United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Danger, in this context, was not meant to refer only to the risk of physical violence.").

## I. The Court Should Detain Kaufman Pending Trial

A preponderance of the evidence shows that the serious risk of flight, obstruction, and harm to the community is simply too high to release Kaufman prior to trial, and there are no conditions that can sufficiently alleviate that risk.

### A. Nature and Circumstances of the Offenses Charged – 18 U.S.C. 3142(g)(1)

Kaufman is currently charged with coercing and enticing an 18-year-old to travel from his home in Massachusetts to engage in commercial sex in Baltimore on two separate occasions. Kaufman used flights, money, gifts, drugs, and alcohol to get what he wanted from this vulnerable

15

young man – oral sex on video that Kaufman could watch over and over to derive pleasure for himself. These were not purely consensual commercial sex transactions. This was a man in his 40s who, working with a 17-year-old, used drugs, money, emotional manipulation, and other tactics to persuade and entice an 18-year-old to travel to engage in sex acts that he did not want to engage in.

### B. Weight of the Evidence Against the Person – 18 U.S.C. 3142(g)(2)

The government's evidence is very strong. As set forth above, there a great deal of evidence to corroborate the charges against Kaufman, including but not limited to text messages, financial transactions, and travel records.

### C. History and Characteristics of the Person – 18 U.S.C. 3142(g)(3)

Not only does the government have abundant evidence of the charged crimes, but the ongoing investigation has uncovered evidence that Kaufman victimized other teenagers in the same way, including minors. The defendant is facing mounting inculpatory evidence and potentially years of incarceration, should this additional evidence lead to charges. This alone is enough to incentivize a criminal defendant to flee. On top of that, this defendant has significant financial means to attempt to hide his behavior or his travel from investigators.

Kaufman also presents a serious risk of self-harm, given the nature of the charge, the corresponding sentence, and his history of attempted suicide. Courts have held that a defendant's risk of self-harm is an appropriate part of the court's assessment of whether the defendant is a risk of nonappearance. *See, e.g., United States v. Workman*, 680 F. App'x 699, 702 (10th Cir. 2017) (holding the court was "within its discretion to consider suicidal ideation and previous suicide attempts in determining whether it [could] reasonably assure [the defendant's] appearance[,]" but

emphasizing that it might have "view[ed] the question differently if the district court considered only . . . suicidal ideation").

### D. Nature and Seriousness of the Danger to Any Person or the Community – 18 U.S.C. 3142(g)(4)

Kaufman is a serious danger to children and young adults. His electronic communications identified to date are replete with requests for pornographic material in exchange for money and negotiations for commercial sex that often includes interstate travel. His use of coercion and manipulation with Victim 1 is easily replicable with other vulnerable young teenagers. There are no conditions of release that can reasonably assure the safety of children from a defendant who, from his own home, uses the internet to exploit them. *See, e.g., United States v. Bryant*, 2020 WL 5163286, at *5 (E.D. Va. Aug. 31, 2020) (finding for detention on first factor where text messages showed defendant asking what sexual acts he could perform on minor); *United States v. McCarty*, 2009 WL 5061577, at *10 (D. Haw. Dec. 24, 2009) (in a child pornography case with some evidence of production, denying motion for release, holding the defendant would pose a danger to the community, in part, because he had "an obvious prurient sexual interest in children and acted upon those interest on multiple occasions."). Here, Kaufman's behavior was not just predatory, it was manipulative. Kaufman used his immense means and privilege to entice children and young men to enter or remain in his sphere, and then threatened self-harm should they not be willing to set their comfort aside to satisfy his needs. The compulsivity and coercion associated with this type of conduct cannot be curtailed with conditions of release.

## CONCLUSION

This 44-year-old defendant stands charged with persuading and enticing a teenager to travel across state lines to engage in prostitution, and the government has evidence that he engaged in similarly harmful criminal conduct with minors. If Kaufman were released, a preponderance of

17

the evidence shows that he is a serious risk of flight. There is also a risk he will obstruct justice by continuing to try to hide evidence. There are no conditions that will reasonably assure Kaufman's appearance and the safety of the community. If he is not detained, it would be far too easy for him to use the internet to further victimize vulnerable teenage boys.

Based upon the foregoing, the government has met its burden to show that no conditions of release will reasonably assure the defendant's appearance, the safety of any person or the community, or the integrity of this proceeding. Accordingly, the government requests the Court order the defendant detained prior to trial.

The government further requests that, if the Court is inclined to release the defendant on conditions, it stay its order for such time as to permit the government to file a motion for revocation of the order of release under 18 U.S.C. § 3145(a).

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: *[signature]*

Paul E.   Budlow
Assistant United States Attorney